UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

CASE NO. 3:18-CV-00471-RGJ

*Electronically Filed*

ANTHONY HEATH BAKER,                                          PLAINTIFF

    v.

MICHAEL JORDAN, ET AL.                                        DEFENDANTS

<u>PLAINTIFF'S COMBINED RESPONSE TO DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT</u>

Plaintiff Anthony ("Ashley") Baker files this combined response to the Motion for
Summary Judgment filed by Defendants Michael Jordan and John Brinker [DN 122] and the
Motion for Summary Judgment filed by Dr. Tanya Young and Dr. Russell Williams [DN 121].

## INTRODUCTION

Baker is an inmate in the Kentucky prison system. While life in prison is unpleasant for
anyone, it is made that much more miserable for a detainee like Baker who is forced to live as a
man even though she knows with every ounce of her being that she is a woman. This has been
Baker's reality for nearly a decade because a medical provider—Dr. Tonya Young—was
deliberately indifferent to the fact that she faced serious health risks from her untreated condition
of gender dysphoria. The factual record contains ample proof that Baker suffers from gender
dysphoria and is needlessly suffering due to lack of treatment. The record is also replete with facts
suggesting that Young recklessly ignored the medical evidence before her very eyes and
consciously chose to dismiss that evidence in favor of flimsy pretexts to withhold care. Moreover,
the factual record amply reflects that Defendant Jordan was also subjectively aware that Baker
needed treatment for her gender dysphoria yet failed to follow through on proposed resolutions to

her grievances under which Baker was promised that appropriately thorough and unbiased evaluations of her medical needs would be performed. Baker has greatly suffered as a result of this pattern of conduct extending over years. The sum total of Defendants' unconstitutional conduct is that Baker has remained trapped in a double prison, one being her physical surroundings and the other being the undeserved prison of her own body that does not reflect her gender identity. The law is clear that prison officials cannot act with deliberate indifference to an inmate's serious medical needs. A jury must determine whether Defendants' conduct warrants a finding of liability under that standard.

## FACTS

All of her life, Baker has felt like a woman trapped in a man's body. Baker Declaration, attached as Exhibit 1, ¶2. When she was a child, she liked to play with dolls and other girls and, as she got older, she began to wear dresses and makeup. *Id.* ¶6. As a teenager, Baker first began to use her preferred first name of "Ashley," and disclosed to her therapists and counselors that she was a girl. *Id.* ¶7. Baker maintained her identity as a woman into adulthood. As an adult, she still presented herself as a woman, and for the first time began to look into medical treatment options to allow her gender identity to more closely match her physical body. *Id.* ¶8. She was prescribed an estrogen patch in her mid-twenties, which she eventually stopped using because she did not believe that it was helping her appear more feminine. *Id.* ¶ 9.

At the time Baker arrived at the Kentucky Department of Corrections ("KDOC"), she was still presenting herself as a woman. She wore long hair and presented as a woman at her court appearances and sentencing. *Id.* ¶10. Upon becoming incarcerated, she immediately disclosed to the Kentucky State Reformatory ("KSR") staff that she was transgender and felt like a woman in a man's body. *Id.* ¶11. In a June 23, 2015 Behavior/Mental Assessment, Psychology graduate

2

student Chris Wiggins wrote that Baker "reports being transgendered and interested in transitioning." KSR Medical Records, attached as <u>Exhibit 2</u>, p. 17.[1] Despite her disclosure to Wiggins, no one from KDOC followed up for over four months. On October 29, 2015, Dr. Khalil, psychiatrist at KSR, saw Baker for psychiatric services and diagnosed her with "gender identity disorder in adolescents or adults" ("GID")[2] and entered her diagnosis into KDOC's medical records system. *Id.* at 18–20.

Yet, even after her diagnosis had been repeatedly documented in her medical record with KDOC, Baker did not receive any gender-affirming care. After nearly seven months of inaction, Baker began to complain. On June 20, 2016, Baker wrote, "I'm being denied medical treatment for my medical condition of Transgender Disorder… I have been given no medical treatment and medical has not had a psychologist to explain what treatment I may need." Grievance 16-0714, attached as <u>Exhibit 5</u>. Defendant Dr. Tanya Young, a KDOC Psychologist, was assigned to respond to Baker's Grievance. In the "Informal Resolution Stage," Dr. Young wrote, "The plan is to assess Anthony Baker for possible referral to the Transgender Committee. Dr. Coleman, Psy.D. will overseeing [sic] this follow up." *Id.*

KDOC has not produced any records that Baker was actually assessed by Dr. Coleman. Instead, the only evidence that any such visit occurred is Baker's own report to Dr. Khalil: "[Baker] states that he met with Dr. Coleman and was told that an outside therapist would be brought in to

---

[1] Young testified that Wiggins was permitted to diagnose patients. Young Dep., excerpts attached as <u>Exhibit 3</u>, p. 9.

[2] From the standpoint of the Diagnostic and Statistical Manual of Mental Disorders (DSM) published by the American Psychiatric Association (APA), gender identity disorder in adults was last listed in DSM-IV TR. Gender identity disorder is a disorder manifested by symptoms such as a stated desire to be the other sex, to be treated as the other sex, or the conviction that he or she has feelings and reactions of the other sex. When revising DSM IV TR to DSM-V the name was changed from gender identity disorder to gender dysphoria and the criteria were modified somewhat. Gunter Report, attached as <u>Exhibit 4</u>, p. 19.

3

provide therapy re: GID issues." KSR Medical Record, Ex. 2, p. 24. Dr. Khalil also included in her report of that encounter that "[Baker] states that in the freeworld he would dress as a female/would wax hair from body—but wasn't on hormones/no surgery. States [s]he had been dressing as a female since age 16yrs." *Id.*

During this same year, Dr. Coleman was working with Dr. Meek, who then served as Director of Psychiatric Services, to develop "workflow" procedures for mental health providers dealing with inmates who identified as transgender. Meek Dep., attached as Exhibit 6, pp. 25–26. But it is undisputed that these procedures were not followed. For example, Baker was never given the GIDYQ (an objective questionnaire designed to determine if patients are gender dysphoric) despite it being considered the "best practice" for diagnosing that condition. *See* Transgender Provider Sequence, attached as Exhibit 7, p. 2. And, as discussed further herein, Baker was never sent to see an endocrinologist or outside provider to be evaluated for hormonal replacement therapy—considered the best and "safest" treatment for transgender patients in prison systems. *See* Meek Dep. Ex. 6, pp. 33–34.

KDOC also failed to present Baker's case to the Therapeutic Level of Care ("TLOC") Committee. On September 29, 2017, Baker issued another formal grievance stating that she had been deceived when she was promised an assessment for referral to the Transgender Committee: "Medical is not following through with their informal resolution to Grievance #16-0714." Grievance 17-1045, attached as Exhibit 8.

Finally, more than a year later, on October 10, 2017, the KDOC convened a TLOC meeting. TLOC Report, attached as Exhibit 9. The TLOC Report is devoid of details about the meeting, but it is clear that it was Dr. Young who shot down any chance of Baker getting the gender-affirming care that she sought. *Id. "*Dr. Young does not agree that Mr. Baker meets the criteria for Gender

Dysphoria at this time." *Id.* Dr. Young described the fallout from the TLOC meeting in a later email:

Thomas, Everett M (DOC)

| | |
|---|---|
| From: | Young, Tanya P (DOC) |
| Sent: | Tuesday, November 21, 2017 4:01 PM |
| To: | Thomas, Everett M (DOC) |
| Subject: | Anthony Baker # 240693 |

Response to Grievance:

Mr. Baker was seen by Psychology and discussed in a Health Services Department Therapeutic Level of Care (TLOC) meeting. It was recommended Psychiatry assess Mr. Baker regarding his diagnosis of Gender Identity Disorder in Adolescents and Adults and his request for Hormone Replacement Therapy (HRT). I have contacted psychiatrist Dr. Meek who has agreed to have an appointment scheduled for Mr. Baker. Once the results of that assessment are made available his case will go back before TLOC for a disposition. Hopefully, all of this will take place within the next 4-5 weeks.

Tanya P. Young, Psy.D.
Licensed Psychologist, Chief

(Email attached as <u>Exhibit 10</u>).

While Young's email suggests that Psychiatry had not assessed Baker for GID, such an assessment had occurred the very day before the TLOC meeting. On October 9, 2017, Baker met with Dr. Steven Shelton and the report from that visit includes GID under both the "Assessments" and "Treatments" made by Dr. Shelton. KSR Medical Records, Ex. 2., p. 11. Baker continued to see Dr. Shelton and, on December 4, 2017, Dr. Shelton entered the following information into Baker's report, "Is 33-year-old Caucasian male with gender identity disorder and PTSD presents for follow-up." *Id.*

In the wake of the TLOC meeting, Baker continued to complain to KDOC about the lack of gender-affirming care. On November 22, 2017, she filed a grievance stating, "I am assigned transgender, and to deny me necessary medical care is cruel and unusual punishment for my transgender issue." Grievance 17-1355, attached as <u>Exhibit 11</u>. In "Requested Action," Baker wrote, "To get psychological treatment, hormone therapy, hormone treatment gender affirming

5

care, la[s]er hair removal, transitioning meds." KSR's Health Services Administration Defendant Michael Jordan interviewed Baker face-to-face in response to this grievance. Jordan Dep., attached as Exhibit 12, pp. 60–61. Jordan wrote as the proposed grievance resolution: "Mr. [sic] Baker you have been evaluated by Psychology (Dr. Young), as well as, Psychiatry (Dr. Shelton). You are scheduled for an appointment with your primary care provider on 1/17/2018 for evaluation for the need for hormonal therapy." Grievance 17-1355, Ex. 11, p. 1.

Baker had a scheduled appointment with a nurse practitioner, Jeff Ingram, on January 17, 2018. KSR Medical Record, Ex. 2, pp. 1–3. The report from that visit states that Baker was "evaluated for possiable [sic] hormone therapy." *Id*. However, the text of the report makes clear that Ingram merely did a physical evaluation of Baker rather than a psychological evaluation determining her need for hormone therapy, and the report also does not indicate that the physical evaluation was focused on tolerance for hormone replacement therapy. *Id.* In fact, the Defendants have admitted the medical record of that appointment provides no indication that the appropriateness of hormone replacement therapy was addressed in any respect. Young Dep., Ex. 3, p. 130 ("Q: Okay.  So when it says, "Evaluated for possible hormone therapy" here, are you saying that does not mean that that's what occurred at this appointment?  A: I don't see where it occurred.  I don't see anything in the body of it that suggests that."); Jordan Dep., Ex. 11, p. 83 ("Q: I mean, is there anything in here pertinent to evaluation for possible hormone therapy?  A: Not that stands out to my attention.").

After again being denied the care that she was promised, Baker disagreed with Jordan's proposed resolution and appealed on the factually accurate grounds that: "There was no appointment with my primary care provider of 1/17/2018 for evaluation for the need for hormonal therapy." Grievance 17-1355, Ex. 11, p. 2. In response to the appeal, the Grievance Committee

made Findings and Recommendations: "Concur with [Jordan's proposed] information resolution. Your case will be discussed in a multidisciplinary team meeting and you will be schedule to see the appropriate provider after that." *Id*. at 3. Baker accepted this offer in good faith on February 2, 2018. *See* Plaintiff's Amended and Supplemental Answers to First Set of Interrogatories Propounded by Defendant Jordan, attached as Exhibit 13, Answer to Interrogatory No. 15, p. 3. As set forth in further detail below in the section on exhaustion of administrative remedies, prison officials subsequently failed to follow up on any aspect of this agreed resolution.

On March 16, 2018, Dr. Meek was tasked with delivering the news to Baker that they would not recognize her gender dysphoria. KSR Medical Record, Ex. 2, pp. 14–15.[3] Dr. Meek informed Baker that he and Dr. Young had "conferred" and both agreed she "was doing fine as a transgender individual." *Id*. at 14. Ostensibly due to Baker's purported lack of distress over the incongruence between her assigned sex and her gender identity, Dr. Meek concluded that Baker "did not meet the criteria for a Gender Dysphoria diagnosis." *Id*. Dr. Meek also told Baker that "at some point [Baker's] case would be presented to the TLOC committee." *Id*.

Baker's case was not presented to the TLOC committee in 2018. Affidavit of Sonja Mays, Administrative Assistant, Kentucky Department of Corrections' Office of Medical Services, attached as Exhibit 15, p. 4. Instead, Baker continued to live without gender-affirming care and has become more distressed about her gender identify. Baker Decl., Ex. 1 ¶ 12. While incarcerated, she has been regularly targeted by other inmates and she has also been the victim of rape and assault. *Id.* ¶ 13.  Baker remained at KSR under these conditions until she was released in 2020.

---

[3] Earlier that week, Dr. Young had emailed Dr. Meek expressing that she did not want to personally notify Baker that her request for hormone replacement therapy had been denied because Dr. Young had "already responded to two complaints from [Baker] to the Psychology Board." 03/01/2018 Email, attached as Exhibit 14.

In 2021, Baker reentered the system due to a purported violation of work requirements at the halfway house where she was living. Although she is currently housed at Little Sandy Correctional Complex, she spent time upon reentry at Roederer Correction Complex.

Upon arrival at Roederer, Baker was examined by a new psychologist who followed proper procedures in using an objective instrument to assess the presence of gender dysphoria. On June 9, 2021, Licensed Psychologist Kellie Bird reported "Ms. Baker was administered the GIDYQ and received a scaled score of 1.77, which is strongly suggestive of gender dysphoria." KDOC Medical Record, attached as Exhibit 16. Plaintiff's expert witness Dr. Gunter[4] notes: "this evaluation stands alone in the record as being informed by the administration of a standardized questionnaire, which is a strategy for decreasing bias that interviewers may bring to any evaluation." Gunter Report, Ex. 4, p. 31.

## RELEVANT PROCEDURAL HISTORY

Baker originally filed claims against Dr. Tanya Young and Michael David Jordan in their official and individual capacities. Since then, both Young and Jordan have left their respective positions with KDOC and Wellpath, respectively. Therefore, for purposes of the official capacity claims, Dr. Young has been replaced by Dr. Russell Williams, the current Psychology Program Administrator for KDOC, and Jordan has been replaced by John Brinker, an employee of Wellpath who is the current Heath Services Administrator at KSR. (See DNs 89 and 112).

Baker litigated this case pro se until this Court appointed her counsel on June 1, 2020. (DN 67).  With the assistance of counsel, Baker supplemented her Response to the Defendant's original motions for summary judgment. (DN 73). Those motions were denied without prejudice and the

---

[4] Dr. Gunter is a Professor of Clinical Psychiatry at the Indiana University School of Medicine. Her qualifications and expertise are beyond dispute. See Gunter Report, Ex. 4.

Court instead re-opened discovery so the parties could conduct additional limited written discovery and depositions. (DN 80). In accordance with the Scheduling Order, Defendants have both now renewed their motions for summary judgment.

## STANDARD OF REVIEW

Summary judgment is only appropriate when the moving party demonstrates that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 317 (1986). Summary judgment "in any case should be cautiously invoked to the end that the parties may be afforded a trial if they really have issues to try." *Bowdidge v. Lehman*, 252 F.2d 366, 368 (6th Cir. 1958) (internal quotation marks omitted). When considering a motion for summary judgment "courts are required to construe all facts and inferences in favor of the non-moving party on summary judgment, and this includes resolving all questions of credibility in plaintiff's favor." *Eisnnicher v. Bob Evans Farms Rest.*, 310 F. Supp. 2d 936, 959 (S.D. Ohio 2004).

If the evidence of record is such that a reasonable jury could return a verdict for the non-moving party, then summary judgment should be denied. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Courts in the Sixth Circuit have not hesitated to do this in Eighth Amendment cruel and unusual punishment cases where there were disputed issues of material fact. *See, e.g., Taylor v. Michigan Department of Corrections*, 69 F.3d 76 (6th Cir. 1995) (reversing trial court granting of summary judgment to warden with respect to claim that he should have had policies in place to review transfer of vulnerable-looking inmates); *Brawner v. Scott County, TN*, 14 F.4th 585 (6th Cir. 2021) (reversing trial court granting of summary judgment to jail nurse where there was record evidence supporting the inference that she was either subjectively aware

of risk to detainee from suddenly discontinuing her medications or recklessly failed to act reasonably to mitigate risk that serious medical need posed to detainee); *Young v. Campbell County, KY*, 846 Fed. App'x 314 (6th Cir. 2021) (reversing trial court granting summary judgment to deputy where trial issues existed as to whether deputy disregarded inmate's obvious need for medical attention); *Stoudemire v. Michigan Dep't of Corrections*, 614 Fed. App'x (6th Cir. 2015) (finding that dispute of material fact as to whether warden was aware of facts from which inference could be drawn that conditions of prisoner's confinement posed substantial risk of serious harm precluded summary judgment on prisoner's § 1983 deliberate indifference claim).

## ARGUMENT

I.     **A reasonable juror could conclude that the Defendants displayed deliberate indifference to Baker's serious medical needs when they refused to provide her with gender-affirming care.**

The Eighth Amendment, applicable to the states under the Fourteenth Amendment, prohibits "cruel and unusual punishment." Const. Amend. VIII. The United States Supreme Court has held that an Eighth Amendment violation occurs when prison officials act with "deliberate indifference" to a "substantial risk of serious harm to an inmate." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). The Court has also affirmed an inmate's Eighth Amendment right to receive appropriate medical care. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). Therefore, "a prisoner's constitutional rights are violated when prison doctors or officials are deliberately indifferent to the prisoner's serious medical needs." *Comstock v. McCrary*, 273 F.3d 693, 700 (6th Cir. 2001) (citing *Estelle*, 429 U.S. at 702).

An Eighth Amendment claim has two components, one objective and one subjective. *Id.* The objective component requires a plaintiff to prove that the alleged deprivation of medical care was serious enough to violate the Eighth Amendment. *Farmer*, 511 U.S. at 834. "[A] medical need is objectively serious if it is one that has been diagnosed by a physician as mandating treatment or

10

one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* at 897 (internal quotation marks omitted and emphasis removed). The subjective component requires a plaintiff to demonstrate that "the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir.2001) (citing *Farmer*, 511 U.S. at 837). "Deliberate indifference entails something more than mere negligence, but can be satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Blackmore v. Kalamazoo Cnty.,* 390 F.3d 890, 895–96 (6th Cir.2004). Subjective knowledge of a substantial risk can be "demonstrat[ed] in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842. "This prevents a defendant from avoiding liability by simply denying knowledge after the fact." *Parsons v. Caruso*, 491 Fed. App'x 597, 603 (6th Cir. 2012). Under this standard, evidence that a reasonable medical provider would have discerned an obvious risk to a patient is sufficient to create an issue for the trier of fact, subject to the right of the defendant to prove they were subjectively unaware of the obvious risk. *Farmer*, 511 U.S. at 842–44.

In *Farmer,* which explained the subjective component of deliberate indifference, the Court held that prison officials could be liable for placing a transgender prisoner in the general population when there existed a substantial risk of harm to that prisoner. *Farmer*, 511 U.S. at 847–49; *see also Greene v. Bowles*, 361 F.3d 290, 294-295 (6th Cir. 2004) (issues of fact existed as to whether warden knew of the risk presented when a transsexual inmate was housed in the same unit with an inmate considered to be a predatory inmate, and whether the warden knew of that inmate's status as a predatory inmate).

### a.  GID and Gender Dysphoria are serious medical needs.

In *Fields v. Smith*, the Seventh Circuit Court of Appeals acknowledged that "GID is a serious medical need" and affirmed the district court's determination that "defendants acted with deliberate indifference in that defendants knew of the serious medical need but refused to provide hormone therapy" because of a prison policy. 653 F.3d 550, 554 (7th Cir. 2011). In doing so, the Court explained that "a person with GID often experiences severe anxiety, depression, and other psychological disorders" and that the "accepted standards of care" include hormones "which have the effect of relieving the psychological distress." *Id.* at 553.

Within the Sixth Circuit, courts have likewise found that medical issues experienced by transgender individuals are sufficiently serious medical conditions, the violation of which can give rise to a constitutional claim under the Eighth Amendment. *See Phillips v. Michigan Dep't of Corr.*, 731 F. Supp. 792, 800 (W.D. Mich. 1990), aff'd, 932 F.2d 969 (6th Cir. 1991) ("Under the facts before me on this motion, I find first that plaintiff suffers from a serious medical need, being deprived of treatment, whether the diagnosis is transsexualism or the gender identity disorder of adolescence or adulthood, non-transsexual type.")

The medical record evidences that Baker was first diagnosed with GID by a KDOC provider in 2015 by Dr. Khalil and Wiggins. That diagnosis also later appears in charts entered by Dr. Shelton. While Young and Meeks later challenged that diagnosis after grievances were filed, they do not appear to dispute that Baker self-identified as transgender and suffered from anxiety and depression. Most recently, on behalf of the KDOC, Licensed Psychologist Dr. Byrd administered an objective questionnaire to Baker and issued an affirmative diagnosis of gender dysphoria. *See* KDOC Medical Record, Ex. 18 ("Ms. Baker was administered the GIDYQ and received a scaled score of 1.77, which is strongly suggestive of gender dysphoria."). Plaintiff's

expert witness, Dr. Campbell, has likewise concluded based on his medical examination of Baker that she did meet the criteria for gender dysphoria. *See* Campbell Report, attached as <u>Exhibit 16</u>, p. 6. Plaintiff's other expert witness, Dr. Tracy Gunter, concluded that the record of this case "supports the claim that discounted, unrecognized an undertreated gender dysphoria resulted in severe emotional distress in the form of the depression, anxiety and hopelessness described by the plaintiff in her affidavit." Gunter Report, Ex. 4, p. 1.

### b. The record contains evidence that Young was deliberately indifferent to Baker's serious medical needs.

There is exactly one reason that Baker has not received the gender-affirming care she has requested: because Dr. Young has stood in the way. Early on, Baker sought treatment from Dr. Young. Baker recalled that "Dr. Young laughed at me and told me that I did not suffer from gender dysphoria." Baker Dec. ¶ 15). A 2015 medical record memorializes Baker's worry that "Dr Young is out to get him [sic]." Ex. 2, p. 22.

As it turns out, Baker's fears were well-founded. Dr. Young was aware that Baker self-identified as transgender by no later than June 20, 2016 when she responded to Grievance #16-0714. By this point, Dr. Young had already been involved with Baker's treatment for over five years. *See id.*, p. 16 (where Baker's record was electronically signed by Dr. Young on 3/04/2011). Yet, as Chief Psychologist, Dr. Young did not follow her own practice of bringing Baker self-identification to the attention of the TLOC committee. *See* Young Dep. Ex. 3, pp. 26–27 (testifying that "once an offender identified themselves as transgender . . . the practice was then to bring that to the attention of the TLOC committee.")

It took 16 months before Baker's case was presented before the TLOC committee; and even then, Dr. Young made sure that Baker would not receive appropriate care. Dr. Young presented her opinion on Baker to the TLOC committee. *Id.* at 67–68. The brief TLOC Notes

13

reflect only her negative opinion without giving any reason: "Dr. Young does not agree that Mr. Baker meets the criteria for Gender Dysphoria at this time." TLOC Report, Ex. 9. Dr. Young's follow-up email states: "It was recommended that Psychiatry assess Mr. [sic] Baker regarding his diagnosis." Ex. 10. There was no acknowledgement that the medical record already contained evidence that Psychiatry has done assessments resulting in GID being on Baker's problem list. Indeed, two years before the TLOC committee commenced, Dr. Khalil entered Baker's official diagnosis of GID into the KDOC medical system. Even more shockingly, the very day before the TLOC meeting, Dr. Steven Shelton saw Baker. The report from Baker's visit with Dr. Shelton lists GID under both the "Assessments" and "Treatments" section. There is no evidence whatsoever that Young took these prior assessments of Baker into account before summarily dismissing her complaints of gender dysphoria.

Instead, Dr. Young ignored all conflicting reports of her colleagues, Drs. Khalil and Shelton, even though those records were easily accessible through the KRS medical system. Dr. Young instead opted to call in an accomplice who would support the evaluation that she had proffered without adequate basis: "I have contacted psychiatrist Dr. Meek who has agreed to have an appointment scheduled for Mr. Baker." Ex. 10. By the time Baker met with Dr. Meek, Dr. Young had already spoken to Dr. Meek ahead of time and shared her biased opinions of Baker. Dr. Meek began his report sharing that he was predisposed to doubt Baker: "[Baker] has been assessed by psychology staff, who did not believe that he met the criteria for gender dysphoria." Ex. 2, p. 7. Like Young, Meek also ignored prior assessments by Wiggins, Khalil and Shelton. For that reason, it's unsurprising that Dr. Meek was quick to agree with his colleague Dr. Young and find that Baker "does not meet the clinical criteria for Gender Dysphoria at this time." *Id.*

The contradictions inherent in the positions taken by Drs. Young and Meek are impossible to reconcile. Both admit that Baker identifies as transgender. At the same time, both doctors were acknowledging the slew of psychological issues from which Baker was suffering—depressing, PTSD, anxiety, nightmares. Yet there is no evidence that Young (or anyone else at KDOC) made the slightest effort to reconcile the facile conclusion that Baker was "doing fine" as a transgender individual with her documented mental suffering. A reasonable juror looking at the medical record and timeline of events could easily conclude that Young chose to be willfully blind to a serious risk that Baker's gender dysphoria was going untreated.

It is telling that Baker's medical records at KDOC contain diagnoses of GID/gender dysphoria both before and after Young's involvement, rendering her contrary assessment an aberration that correlates more with resistance to Baker's grievances than thorough evaluation of her case. Not surprisingly given her minority position on the diagnosis, Dr. Young's proffered reason for finding Baker did not have gender dysphoria does not withstand scrutiny under the standard she cites, the DSM-V. At the TLOC committee meeting, she presented her opinion that "Baker did not meet the criteria, per the DSM-V, for gender dysphoria." Young Dep. Ex. 3, pp 67–68. Expert witness Tracy Gunter found that Dr. Young used an incorrect or atypical application of the DSM-V criteria. Gunter Report, Ex. 4, p. 29. First, Dr. Young's conclusion that Baker was not distressed enough to meet the criteria for gender dysphoria represents diagnostic overshadowing. *Id.* at 30. "There is no evidence in the available record or deposition testimony that anyone made any attempt to work with [Baker] or identify or understand the various sources of distress in her life. *Id.* Also, Dr. Gunter found that Dr. Meek made a grave error in applying the diagnostic criteria in DSM-V, an error which Young picked up in her own assessment. In explaining the reason that he and Dr. Young concluded that Baker was not dysphoric, "Dr. Meek

stated that someone needed to both have clinically significant distress **and** social or occupational dysfunction to meet criteria for a diagnosis." *Id.* (emphasis in original). "The fourth and fifth editions of the DSM both use the qualifying statement 'The condition is associated with clinically significant distress **or** impairment in social, occupational, or other important areas of functioning.'" *Id.* (emphasis in original). Thus, in relying on Meek's improper application of the criteria, Young proceeded on the erroneous assumption that in addition to subjective suffering there must also be impairment to social or occupational functioning.

When correctly applying the DSM-V criteria, expert witness Dr. Robert Campbell found that "Ashley Baker meets the criterion for gender dysphoric disorder as set forth in DSM-5-TR." Campbell Report, Ex. 17, p.6. He opined that "[t]he extended duration of her inner conflict over her gender identity is manifest in the myriad of psychiatric diagnoses that she has received," and he "strongly believe[s] that Ashley would greatly benefit from being able to receive hormonal replacement therapy." *Id.*

Dr. Gunter also found that her review of the record "supports the diagnosis of gender identity disorder in 2015 made by Dr. Khalil and gender dysphoria in 2021 made by Dr. Byrd." Gunter Report, Ex. 1, p.1. It is important to remember that Dr. Byrd is Dr. Young's own colleague, at KDOC, who correctly used an objective instrument to assessment Baker for gender dysphoria in accordance with proper procedure. With respect to the other providers—including specifically Dr. Young—Dr. Gunter stated:

> [The record] fails to support the rejection of the diagnoses of gender identity disorder and gender dysphoria during the intervening years. In particular, I found the evaluations of Drs. Meek, Young and Shelton and others to be inadequate to establish the presence (or absence) of gender identity disorder or gender dysphoria on the basis of inadequate interviewing, inadequate consideration of institutional information, inadequate consideration of outside information, inappropriate discounting of signs of distress, lack of recognition of multiple sources of distress, and lack of understanding (or atypical interpretation) of the diagnostic criteria on

which they said that they relied in order to reject the diagnosis of gender identity disorder or gender dysphoria.

*Id.* at 1; *see also id.* at 21–31 (fully explaining basis for conclusions).

Dr. Young ignored every piece of evidence that did not fit her preferred narrative. Her visits with Baker were outcome driven meetings to prove her own preconceived idea that Baker was not actually gender dysphoric and instead had some hidden agenda. For this reason, Dr. Young made no effort to evaluate Baker's need for treatment for gender dysphoria and ignored the fact that Drs. Khalil and Shelton had previously entered a diagnosis of GID into Baker's KSR medical records. Her mirthful reaction to Baker's predicament—as testified to by Baker under oath in her declaration—evidences her extreme bias and disregard toward Baker. The documents and testimony, viewed in the light most favorable to Baker, support the objective and subjective components of the deliberate indifference standard, and warrant a denial of summary judgment.

An illustrative precedent is *Parsons v. Caruso*, 491 F. App'x 597, 604 (6th Cir. Aug. 7, 2012) (unpublished). In *Parsons*, an inmate suffering from seizure disorder died of a seizure after not receiving his seizure medication for three days during a transfer between facilities. The Court held that there was a jury question as to whether a medical intake nurse was aware of the obvious risk to the inmate from going off the medication and made a conscious choice to disregard the risk by not obtaining the medication from in-house stocks and allowing the inmate to wait longer until they medications arrived from an outside pharmacy. *Id.* at 604. Her testimony that she did not believe the situation was an emergency, *id.* at 599, was insufficient to support summary judgment.

Likewise in this case, a jury could conclude that Young was aware of the obvious risk to a gender dysphoria sufferer who has not been thoroughly evaluated for the need for gender-affirming care and specifically hormone replacement therapy. There is evidence that Young failed to do a thorough review of the medical record and chose not to exert the effort to properly evaluate Baker's

history and complaints, instead inappropriately discrediting Baker's reports and ignoring facts that were evident from the medical record. The diagnoses of gender dysphoria from other providers—both before and after Young's involvement – reinforce the conclusion that she was recklessly indifferent to an obvious risk of harm to Baker's mental health.

In sum, evidence of record does not permit the conclusion, as a matter of law that this case is merely about a good faith disagreement among providers over the need for medical treatment. There is both direct and circumstantial evidence that the failure to properly diagnose and treat Baker in accordance with the DSM-V and KDOC policies and evidences a years-long effort of one provider to sabotage an inmate's access to receive gender-affirming care. At a minimum, the evidence shows that Young followed a course of diagnosis and treatment so sloppy and biased as to evidence deliberate indifference to a serious medical need. Specifically, there is ample record evidence that Young was subjectively aware that other providers had diagnosed Baker with gender dysphoria and consciously chose to ignore that information while not doing a correct assessment of her own and relying upon a biased process that misapplied DSM-V.

### c. A reasonable juror could find that Jordan exhibited deliberate indifference by failing to follow through on commitments made to Baker to ensure access to treatment of her gender dysphoria.

While Baker was at KSR, Defendant Michael Jordan served as the Health Services Administrator. Jordan testified that while he did not have any clinical input into the care of transgender inmates, he "would help facilitate getting [inmates with gender dysphoria] an appointment with, whether it be mental health, psychiatry, or medical." Jordan Dep., Ex. 12. p. 33. Jordan acknowledges that "because [people who identify as transgender] would be considered a vulnerable population, to make sure that if they request medical [care] that it's provided." *Id.* at 29.

Jordan was also subjectively aware that Baker self-identified as transgender. As Health Services Administrator, Jordan testified that either he or his assistant would have attended the initial October 2017 TLOC Committee meeting at which Young summarily dismissed Baker's request for gender-affirming care. *Id.* at 75–76. Even though Jordan subjectively knew that Baker fit into the "vulnerable population" of inmates who identify as transgender, as set forth below, he deliberately chose to ignore the risks this posed to her safety.

Despite his title of Health Services Administrator, Jordan did not administer appropriate health services to Baker. Jordan did nothing to see that Baker was continually reviewed by the TLOC. After Dr. Young opined that Baker did not meet the criteria for gender dysphoria on October 10, 2017, Baker's case was not reconsidered by the TLOC Committee for the remainder of 2017 or anytime in 2018. *See* Mays Aff., Ex. 15. Baker remained at KSR untreated and vulnerable.

Jordan also personally addressed Baker's grievance that "I am assigned transgender, and to deny me necessary medical care is cruel and unusual punishment for my transgender issue." Grievance 17-1355, Ex. 11. Prior to that meeting, her reviewed Baker's medical records (Jordan Dep., Ex. 12, pp. 78–79) and presumably saw that GID was on her list of problems. In order to induce Baker to drop the grievance, Jordan represented to Baker in a face-to-face meeting: "You are scheduled for an appointment with your primary care provider on 1/17/2018 for evaluation for the need for hormonal therapy." Ex. 11. This was a misrepresentation of what was planned to occur at that provider visit. Instead of being evaluated on her need for hormonal therapy, on the day in question, Baker had an appointment with Jeff Ingram, a nurse practitioner. Defendants admit that there was no evaluation of the need for hormone replacement therapy at the appointment with Nurse Ingram. Young Dep., Ex. 3, p. 130; Jordan Dep., Ex. 12, p. 83. After seeing that herself,

Baker appealed: "There was no appointment with my primary care provider of 1/17/2018 for evaluation for the need for hormonal therapy." Grievance 17-1355, Ex. 11. Jordan never again discussed the resolution of Baker's grievance. Jordan Dep., Ex. 12, p. 67.

When deposed, Jordan admitted that an appointment with a primary provider such as Nurse Ingram could only be to determine if Baker's body could handle the treatment—not to address whether the treatment was indicated because requirements of gender dysphoria were met. Jordan Dep., Ex. 12, pp. 82–86. This observation is significant because Jordan had already testified that such an assessment by a primary care provider is done _after_ the determination has been made that the inmate's condition of gender dysphoria warrants treatment through hormone replacement therapy. _Id._ at 40 (stating that his understanding of DOC policy was that "once they meet the criteria for gender dysphoria per Psychology and Psychiatry, they were then seen per medical to have an evaluation and lab work prior to being send out to University of Louisville Endocrinology."). Thus, the nature of the appointment that Jordan proposed to Baker as a favorable resolution suggests a belief that the diagnostic criteria had been established based on the medical record and it was time to move to the next step.

Thus, either Jordan had tacitly agreed that hormone replacement therapy was already indicated based on prior diagnoses by Drs. Khalil and Shelton, or he was aware he was sending Baker to an appointment with a nurse practitioner who could not make the predicate diagnosis. Either way, the promised resolution was not implemented, and Baker continued to be denied care. The record suggests that the proposed resolution was a sham marked by deliberate indifference to a risk of serious harm to Baker if her condition was not properly diagnosed and treated.

The circumstantial evidence is abundant that Jordan knew of Baker's gender identity disorder, knew of the serious issues this caused for her while incarcerated, and intentionally or

recklessly decided not to coordinate her required medical care although it was his duty to do so as Health Services Administrator at KSR. For this reason, a reasonable trier could conclude that Jordan was deliberately indifferent to Baker's serious medical needs.

## II. The factual record supports the conclusion that the grievance process was unavailable to Baker as a matter of law due to machinations and misrepresentations.

The argument that an inmate's claim must be dismissed because he did not exhaust his remedies is an affirmative defense that must be proven. *Jones v. Bock*, 549 U.S. 199, 216 (2007). "Because the Defendants bear the burden of proof on exhaustion, they bear an 'initial summary judgment burden [that] is higher in that [they] must show that the record contains evidence satisfying [their] burden of persuasion' and 'that no reasonable jury would be free to disbelieve it.'" *Does 8-10 v. Snyder*, 945 F.3d 951, 961 (6th Cir. 2019) (alterations in original) (quoting *Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012)). It is only if a defendant proves "that no reasonable jury would be free to disbelieve [that proper exhaustion occurred]" that a court may dismiss a plaintiff's case because he failed to exhaust his remedies. *Id.; see also Wiley v. Kentucky Dep't of Corr.*, No. 19-5368, 2020 WL 12933851, at *2 (6th Cir. Aug. 25, 2020). Accordingly, this Court must deny the motions for summary judgment on exhaustion grounds if the Defendants have failed to conclusively demonstrate that they have met their heavy burden. *Risher v. Lappin*, 639 F.3d 236, 240 (6th Cir. 2011).

The Prison Litigation Reform Act ("PLRA") requires inmates to exhaust available administrative remedies before they may seek relief in court. 42 U.S.C. § 1997e(a). However the United States Supreme Court has squarely held that a prisoner need not exhaust an "unavailable" grievance process, *i.e.* (1) a grievance process that "operates as a simple dead end," (2) a grievance process that is "so opaque that it becomes, practically speaking, incapable of use," or (3) "when

prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross v. Blake*, 578 U.S. 632, 643–44 (2016).

Here, there are disputed factual questions as to whether prison officials in this instance thwarted Baker from appealing the proposed resolution of the Grievance Committee to the Medical Director within the required three business days. See CPP 14.6.II.K.2.f, attached as Exhibit 18.[5] The factual record contains evidence that the resolution of Grievance No. 17-1355 proposed in writing by the Grievance Committee in order to induce Baker to drop her appeal was not carried out according to its express terms. By the time Baker knew that they had no intention of following through, she could not try to rescind her agreement and appeal because the time for appeal had run. Moreover, the factual record contains unrefuted evidence that during discussions over the informal resolution, prison officials orally promised Baker that her evaluation for hormone replacement therapy would be addressed by health care providers other than those whose conduct had led Baker to file the grievance in the first place. These representations also turned out to be false. Defendants have failed to demonstrate the absence of an issue of material fact concerning whether their actions rendered administrative remedies unavailable to Baker, and they have therefore not carried their burden of persuasion on this affirmative defense.

### A. The Grievance Process Was Unavailable Because of Machination and Misrepresentation.

An administrative remedy is deemed "unavailable" if "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or

---

[5] "The grievant shall have three (3) business days from the date of the notice of the committee's recommendation to file his appeal with the Grievance Coordinator…. The inmate shall state a basis for the appeal on the appeal form. The Grievance Coordinator shall forward the appeal to the Department of Corrections Medical Director's Office." See also *id*., II.K.3.a. ("The Medical Director shall review the grievance and make a final decision.")

intimidation" such as by "misle[ading] or threaten[ing] individual inmates so as to prevent their use of otherwise proper procedures." *Ross*, 578 U.S. at 644. This "interference with an inmate's pursuit of relief renders the administrative process unavailable." *Id.* The key question is whether the prison officials' actions would "deter a person of ordinary firmness" from continuing to pursue his grievance. *Himmelreich v. Federal Bureau of Prisons*, 766 F.3d 576, 577 (6th Cir. 2014) (internal quotation marks omitted).[6]

In this instance, prison officials repeatedly failed to follow through on representations they made to induce Baker—who has learning disabilities and low IQ—not to appeal further. The chronology of events with respect to the handling of Baker's heath care grievances shows this clearly. Baker first filed a grievance alleging lack of treatment for gender dysphoria on June 21, 2016. *See* Grievance No. 16-0714, Ex. 5 ("I'm being denied medical treatment for my medical condition of Transgender Disorder, by the medical provider CCA [sic, Correct Care Solutions] which has a contract to provide medical care."). On August 3, 2016, Baker registered agreement with Young's proposal that "[t]he plan is to assess Anthony Baker for possible referral to the Transgender Committee, Dr. Coleman, PsyD. will [be] overseeing this follow up." *See id*. There is no evidence in the record that this plan to be overseen by Dr. Coleman was ever implemented.[7]

The chronology of medical records set forth in Young's own brief establishes that over the next 15 months, Baker saw a number of providers, including Drs. Khalil, Shelton, and Young. This

---

[6] Defendants cite the opinion in *Brooks v. Silva*, 2015 WL 12762112, *4 (6th Cir. April 6, 2015) as if it sets up a bright line rule requiring an inmate to satisfy every step in the grievance appeals process. That opinion pre-dates the Supreme Court's decision in *Ross v. Blake* that sets forth the test for when a grievance process will be found to be unavailable to an inmate, thus excusing its completion. To the extent *Brooks v. Silva* is inconsistent with *Ross v. Blake*, it is no longer good law.

[7] In her summary judgment brief, when describing Baker's statements to Dr. Khalil during an August 30, 2016 visit, Young puts "Dr. Coleman" in quotes as if she doesn't know who that person is. *See* Mem. in Support of Summ. J. [DN 121-1] at 4. However, this psychologist is named in the very informal dispute resolution that Young herself signed.

period culminated in a November 21, 2017 visit with Dr. Young in which she made no effort to evaluate Baker's need for treatment for gender dysphoria and seemingly ignored the fact that Drs. Khalil and Shelton had previously included "gender identity disorder" on Baker's problem list. During that visit, Young instead merely expressed skepticism that Baker was making accurate reports of her condition. Young Response Brief, p. 5 (third bullet point).

The next day, November 22, 2017, Baker filed Grievance 17-1355, which echoes the 2016 Grievance in stating, "I am assigned transgender, and to deny me necessary medical care is cruel and unusual punishment for my transgender issue." Ex. 11. This grievance also requested that Baker "get psychological treatment, hormone therapy, hormone treatment gender affirming care, lazier (sic) hair removal, transitioning meds." *Id*. At the informal resolution stage, after a face-to-face meeting between Jordan and Baker on or about January 11, 2018, Jordan proposed the following as an informal resolution: "Per our face-to-face conversation, Mr. Baker you have been evaluated by Psychology (Dr. Young) as well as, Psychiatry (Dr. Shelton). You are scheduled for an appointment with your primary care provider on 1/17/2018 for evaluation for the need for hormonal therapy." *Id*. Baker did not accept this proposal and appealed to the Grievance Committee on January 22, 2018. *See id*.

In her appeal, Baker noted that "[t]here was no appointment with my primary care provider on 1/17/15 (sic, 2018) for evaluation for the need for hormonal therapy." *Id*. In this regard, Baker's basis to appeal was well-founded. Both Young and Jordan have admitted that the medical record of Baker's 1/17/18 visit with Nurse Practitioner Jeff Ingram gives no indication of any evaluation of the need for hormone replacement therapy. Young Dep., Ex. 3, p. 130; Jordan Dep., Ex. 12, p. 83.

After purportedly reviewing Baker's complaint and her medical records, the Grievance Committee made a number of Findings and Recommendations: First, they stated that they "Concur with the information resolution." Grievance 17-1355, Ex. 11.  This could mean only one thing—that the Committee agreed with and ratified Jordan's proposal at the informal resolution stage that Baker should be *evaluated by a primary care provider for hormone replacement therapy*. In that context, the Committee also made a new recommendation that: "Your case will be discussed in a multidisciplinary team meeting and you will be schedule to see the *appropriate provider* after that." *Id*. at 3 (emphasis supplied).

Baker accepted this offer in good faith and did not appeal. *See* Answers to Interrogatories, Ex. 13, p. 3. Jordan and other prison officials subsequently failed to follow up on any aspect of this agreed resolution. Most glaringly, Baker's case was not discussed in any "multidisciplinary team meeting." Young testified that "multidisciplinary team meeting" refers to the Therapeutic Level of Care (TLOC) meetings. Young Dep., Ex. 3, pp. 82–83 ("Q:  What does the multi-disciplinary team refer to? A: I believe that's referring to TLOC.").[8] That testimony is wholly consistent with the Department of Corrections' own policies and procedures for transgender inmates. See CPP 14.8, attached as Exhibit 19, I. Definitions ("Therapeutic Level of Care (TLOC)" is a multi-disciplinary committee that consists of medical providers, nurses, psychiatric providers, psychologists, security and other staff as needed working together on complex mental health and medical cases.") It is undisputed that Baker's case had last been discussed in a TLOC convened months earlier in October 2017, prior to Grievance 17-1355. It is further undisputed that there is *no record of Baker's case being discussed in any TLOC in the entire year of 2018*. *See* Mays

---

[8] Jordan also volunteered that the term could be referring to the TLOC but then equivocated. Jordan Dep., Ex. 12, pp. 67-68 ("Whether they are saying that is TLOC or not, I -- I don't -- I don't know what they meant by that.").

Affidavit, Ex. 15 ¶ 4. Thus, the record is clear that the representation by the Grievance Committee that this would meeting would occur turned out to be false.[9]

Equally important is the fact that Baker was never seen by the "appropriate provider" after the TLOC had met, as promised. The phrase "appropriate provider" was used in the sentence immediately following the sentence in which the Grievance Committee expressly concurred with the informal resolution originally proposed by Jordan. Thus, read in context, this "appropriate provider" was to be a primary care provider who would evaluate Baker for hormone replacement therapy. Instead, in the succeeding two months Baker was seen again by Young and Meek,[10] who dug in their heels on their position that Baker was not dysphoric and merely needed to be educated on the difference between being transgender and suffering from gender dysphoria.  See Young Response Brief, pp. 6–7 (describing medical records of visits in March and April 2018). This, too, was an obvious bait and switch that did violence to the text of the Grievance resolutions and the reasonable expectations of Baker when she decided to accept the resolution instead of appealing a second time to the Medical Director.

The Supreme Court has stated that "if the correctional facility's staff misled the inmate as to the existence or rules of the grievance process so as to cause the inmate to fail to exhaust such process" then a remedy is not available and exhaustion is not necessary. *Ross v. Blake*, 578 U.S. at 644, n. 3 (2016) (quoting *Davis v. Hernandez*, 798 F.3d 290, 295 (5th Cir. 2015)). Applying this principle, the Sixth Circuit has found that misrepresentations by prison officials were sufficient to

---

[9] The medical records also prove that this TLOC meeting did not occur. Indeed, the records reflect that after Dr. Meek informed Baker she "was doing fine as a transgender individual," he then stated that "Baker's case would, *at some point*, be presented to the TLOC committee…." *See* Mem. in Support of Summ. J. [DN 121-1] at 8 (emphasis added).

[10] Baker was also again seen by Dr. Shelton, whose chart now conveniently omitted GID from the problem list.

excuse a lack of exhaustion. In *Does 8-10 v. Snyder*, 945 F.3d 951, 964 (6th Cir. 2019), the Court determined that a grievance process was full of "contradictions and machinations" because prison officials did not properly administer the three step process. For example, officials "failed to provide an appeal form [to the Plaintiffs]," did not send investigation findings to Plaintiffs, and inaccurately described the process to them. *Id.* at 965–67; *see also Williams v. Corr. Officer Priatno*, 829 F.3d 118 (2d Cir. 2016) (grievance process unavailable where a plaintiff alleged that he did not receive the required grievance responses and that the officers did not properly file the completed form). Likewise in this case, the record supports the conclusion that misrepresentations to Baker regarding what would be done to resolve her grievance rendered the process unavailable as a matter of law. If misleading an inmate about the rules governing the grievance process as in *Does 8-10 v. Snyder* is sufficient for excusing a failure to exhaust, then making misrepresentations about promised actions steps that deter an inmate from further pursuing the grievance process supply equivalent or greater grounds for this result.

The evidence of false representations made by prison officials during the grievance process at a minimum creates a jury question as to the issue of exhaustion of administrative remedies. *See Daniel v. Harper*, No. 5:17-CV-19-TBR, 2017 WL 6522090, at *5 (W.D. Ky. Dec. 19, 2017) ("And from the filings in this case and the case law detailed above, the Court cannot rule as a matter of law that Plaintiff failed to exhaust remedies that do not appear to have been available to him at the time. There is a difference between an inmate's lack of knowledge about the appeals process and documentation given to him which misrepresents that process."); *see also Wiley v. Kentucky Dep't of Corr.*, No. 19-5368, 2020 WL 12933851, at *3 (6th Cir. Aug. 25, 2020) (viewing the record in the light most favorable to the plaintiff, a two-word handwritten note by prison

officials on grievance did not, as a matter of law, put inmate on reasonable notice that he could not request removal of staff in his grievance).

Prison officials' written misrepresentations were compounded by false verbal communications upon which Baker reasonably relied in accepting a proposed resolution instead of appealing. Baker has testified that "[d]uring the grievance process I was told that I would be able to see a different doctor. I was also told that I would go in front of a board to discuss hormone treatment. These promises were not kept." Baker Decl., Ex. 1 ¶ 21.  Defendants have produced no testimony to refute Baker's recollections in this regard. Her testimony is entirely credible. Having already grieved the denial of treatment for gender dysphoria on two separate occasions—and been stymied—it stands to reason that Baker would expect the proposed resolution to involve different providers from the ones whose biased and cursory review of her case had previously resulted in a denial of treatment. Further, her testimony that she "would go in front of a board" in entirely consistent with the resolution proposed by the Grievance Committee involving prompt review by the TLOC. While Defendants quibble over the fact that Baker could not be physically present at a TLOC meeting, the key concept is that her case will be presented at a multi-disciplinary team meeting as opposed to her being seen again in piecemeal fashion by the same two providers whose conduct had led to the grievances in the first place. Baker's declaration is sufficient to create a jury question. *See Gilmore v. Ormond*, No. 19-5237, 2019 WL 8222518, at *2 (6th Cir. Oct. 4, 2019) ("The district court erred in concluding that Gilmore's assertions that prison officials prevented him from exhausting his administrative remedies, treated as if set forth in an affidavit or declaration, were insufficient to defeat summary judgment.").

Defendants suggest that what Baker reasonably believed is not relevant to the determination of whether she exhausted her administrative remedies. The case law says otherwise.

Courts have also concluded that exhaustion may be excused if a "Plaintiff *reasonably could have*

*concluded* . . . that prison officials were addressing his grievance via the [grievance] procedure . .

. and that he did not need to proceed further through the . . . grievance procedure." *Billiter v.*

*Aufdemkampe*, 2020 WL 430947, at *3 (S.D. Ohio Jan. 28, 2020), *report and recommendation*

*adopted sub nom. Billiter v. Wheeler*, 2020 WL 1067188 (S.D. Ohio Mar. 5, 2020) (quoting *Miller*

*v. Klee,* 2018 WL 1354473, at *8 (E.D. Mich. Feb. 23, 2018)) (emphasis added); *McRae v.*

*Louisville-Jefferson Cnty. Metro Gov't*, No. 319CV00313GNSCHL, 2022 WL 812380, at *3

(W.D. Ky. Mar. 16, 2022) ("Trinity argues that Duncan and McRae did not exhaust their full

available administrative remedies because they did not file an appeal . . . . However, there is an

issue of fact about whether a *reasonable inmate would have understood* that they received an

appealable order.") (emphasis added).

Here, prison officials told Baker that her grievance would be resolved in a way she found

acceptable. Instead, they took no follow-up action and provided Baker no access to any other

doctors or options for treatment. Drawing all reasonable inferences in favor of Baker, as this Court

must do at the summary judgment stage, prison officials broke their promises to her in bait-and-

switch fashion. And if prison officials entering into a resolution promising action would deter a

person of ordinary firmness from continuing to pursue their grievance, one can see how pretending

to reach an agreement and then not performing it—as must be inferred from this factual record—

would be a convenient stratagem to make the grievance process wholly empty. Based on the

existing factual record, this Court cannot make a finding of failure to exhaust as a matter of law

and must allow Baker's claim to proceed.

Defendants suggest that the Court should ignore any evidence of verbal misrepresentations

by prison officials, but they provide no authority for that proposition. While Baker contends that

the misrepresentations made by prison officials in written documents during the grievance process were objectively misleading—and alone support a denial of summary judgment—the evidence of verbal misrepresentations is just as pertinent. An analogy may be had to Kentucky law on common law fraud. Kentucky courts have held that a party who agrees to a written contract without reading it can still prevail on a fraud claim upon proof that the other party was making contemporaneous fraudulent misrepresentations about the contents of the documents. *See Hanson v. Am. Nat. Bank & Tr. Co.*, 844 S.W.2d 408, 413 (Ky. 1992), *cert. granted, judgment vacated,* 509 U.S. 918, 113 S. Ct. 3029, 125 L. Ed. 2d 717 (1993) ("If the jury determines that the party signing the contract without reading it exercised ordinary care and that the person who induced the party did so through fraud and misrepresentation, a tort action for fraud is the appropriate remedy."); *see also Cline v. Allis-Chalmers Corp.*, 690 S.W.2d 764, 766–67 (Ky. Ct. App. 1985) ("In general, a person who has the opportunity to read a contract, but does not do so and signs the agreement, is bound to the contract terms ***unless there was some fraud in the process of obtaining his signature***") (emphasis supplied).

### III. Defendants are not entitled to summary judgment on their affirmative defense of qualified immunity.

Defendant Young makes a brief argument that she is entitled to qualified immunity on the individual claim against her because Baker cannot prove a constitutional violation. *See* Mem. in Support of Summ. J. [DN 121-1] at 28.[11] Presumably because there is a large body of law

---

[11] To be clear, the qualified immunity defense applies only to the claims for damages brought against Young in her individual capacity. The qualified immunity defense has no applicability to Williams who, due to Young's retirement, has been substituted for Young with respect to the official capacity claim. *Kentucky v. Graham*, 473 U.S. 159, 167, 105 S. Ct. 3099, 3106, 87 L. Ed. 2d 114 (1985) ("The only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, *qua* entity, may possess, such as the Eleventh Amendment."). Under *Ex Parte Young*, 209 U.S. 123 (1908), the official capacity claim is limited to Baker's claim for prospective injunctive relief in order to avoid running afoul of the Eleventh Amendment.

concerning the Eighth Amendment rights of inmates to have their serious medical needs addressed, Young has conceded that issue for purposes of summary judgment. Baker agrees that the question of Young's entitlement to qualified immunity merges with the question of whether she is entitled to summary judgment on liability under the deliberate indifference standard. *See Parsons v. Caruso*, 491 F. App'x 597, 602 (6th Cir. 2012). Therefore, for the same reasons Young is not entitled to summary judgment on liability, as set forth above, she is not at this stage entitled to qualified immunity as a matter of law. She will be entitled to raise qualified immunity as a defense at trial to Baker's claims for damages.

### IV. Brinker is not the subject of an individual-capacity claim for damages; Baker may pursue her official capacity claims against Brinker and Williams for prospective injunctive relief.

This action presently involves claims under 42 U.S.C. § 1983 for (1) damages against Young and Jordan in their individual capacities and (2) prospective injunctive relief against Brinker and Williams in their official capacities. Originally, Young and Jordan were the Defendants on both the individual and official-capacity claims, but this changed due to their retirements from the Department of Corrections and Wellpath (f/k/a Correct Care Solutions), after which point their successors Williams and Brinker were substituted on the official capacity claims for injunctive relief.

It is well established that under *Ex parte Young*, 209 U.S. 123 (1908) there is no Eleventh Amendment immunity from a claim to require a state official to comply with supreme federal law under 42 U.S.C. § 1983. Both state employees and private government contractors such as Young and Jordan are amenable to suit under Section 1983. *West v. Atkins*, 487 U.S. 42 (1988) (holding a physician under part-time contract with the state can be subject to 1983 liability); *Santiago v. Ringle*, 734 F.3d 585, 590 (6th Cir. 2013) (explaining the standard for "prison doctors"). As state officials sued in their official capacities, however, Brinker and Williams can only be subject to

prospective injunctive relief. *See Edelman v. Jordan*, 415 U.S. 651, 677, 94 S. Ct. 1347, 1362, 39 L. Ed. 2d 662 (1974) ("Though a § 1983 action may be instituted by public aid recipients such as respondent, a federal court's remedial power, consistent with the Eleventh Amendment, is necessarily limited to prospective injunctive relief, Ex parte Young, supra,…"); *accord Sutton v. Evans,* 918 F.2d 654, 657 (6th Cir.1990) (stating that there is "ample room for an action against state officials insofar as it seeks prospective relief allowed by the Eleventh Amendment"); *McKay v. Thompson,* 226 F.3d 752, 757 (6th Cir. 2000) (finding that "[t]he district court correctly determined that the Eleventh Amendment permits prospective injunctive relief, but not damage awards, for suits against individuals in their official capacities under 42 U.S.C. § 1983."). Thus, both Brinker and Williams are proper defendants in their official capacities so that, upon a finding of liability, the Court has a mechanism to order the Department of Corrections and Wellpath to comply with supreme federal law in accordance with *Ex parte Young*.[12]

For these reasons, the Defendants' citations to *Kentucky v. Graham* and *Monell v. New York City Dep't of Soc. Servs*. are inapposite. *Monell* only permits a Section 1983 clam against a *municipality* upon proof that the constitutional violation resulted from a policy or custom. The Department of Corrections and Wellpath are not municipalities. Moreover, Baker has not brought

---

[12] "A plaintiff seeking injunctive relief against the State is not required to allege a named official''s personal involvement in the acts or omissions constituting the alleged constitutional violation." *Hartmann v. California Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1127 (9th Cir. 2013) (citing *Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Kentucky v. Graham,* 473 U.S. 159, 166 (1985)). "Rather, a plaintiff need only identify the law or policy challenged as a constitutional violation and name the official within the entity who can appropriately respond to injunctive relief." *Id.* (citing *L.A. Cnty. v. Humphries,* 562 U.S. 29, 36-3 (2010); *Hafer,* 502 U.S. at 25); *see also Pouncil v. Tilton*, 704 F.3d 568, 576 (9th Cir. 2012) (the proper state defendant in a § 1983 action that seeks prospective injunctive relief is the person who "would be responsible for ensuring that injunctive relief was carried out, even if he was not personally involved in the decision giving rise to [the plaintiff's] claims") (citing *Gonzalez v. Feinerman,* 663 F.3d 311, 315 (7th Cir. 2011) (prison warden was proper defendant for a claim of injunctive relief, notwithstanding his lack of personal involvement in the challenged conduct, because he would be responsible for ensuring that the injunctive relief was carried out)).

damages claims against these entities but, rather, against Williams and Brinker in their official

capacities for prospective injunctive relief under *Ex Parte Young*. Brinker is therefore wrong in

suggesting Baker needs to prove a policy or custom in order to prevail on her claims for injunctive

relief. See Jordan/Brinker Brief, p. 10. Indeed, "the policy or custom requirement is "a liability

standard for suits against municipalities ... and it has no applicability to state officers who are

immune from suit for damages but susceptible to suit under *Ex Parte Young* for injunctive

relief." *Spann v. Hannah*, No. 20-3027, 2020 WL 8020457, at *3 (6th Cir. Sept. 10, 2020) (citing

*Rounds v. Clements*, 495 F. App'x 938, 941 (10th Cir. 2012) (citing *Monell v. Dep't of Soc. Servs.*,

436 U.S. 658, 694-95 (1978)).[13]

Finally, Defendants Jordan and Brinker question Baker's entitlement to permanent

injunctive relief. However, they merely assert in conclusory fashion that Baker cannot meet the

test for injunctive relief set forth *Edmo v. Corizon*, 935 F.3d 757, 784 (9th Cir. 2019). In the

absence of any reasons why injunctive relief is not available, this argument must be rejected.

However, to the extent that a response is required, the factual record clearly establishes that an

injunction to enforce federal law is warranted. Specifically, Baker's declaration and her medical

records evidence extreme mental distress arising from her gender dysphoria, including depression,

anxiety, PTSD, and suicide attempts. Dr. Gunter has opined that gender dysphoria can cause severe

mental distress. The facts in the record are more than sufficient to establish irreparable injury. *See*

---

[13] Brinker cites the case of *Street v. Corr. Corp. of Am.*, 102 F.3d 810 (6th Cir. 1996). That case involved
Section 1983 claims against CCA and two of its employees. CCA was providing services for a correctional
facility run by the governments of Nashville and Davidson County. Accordingly, the court held that CCA
was protected from vicarious liability under *Monell* to the same extent as a municipality. *Id.* at 818. That
ruling has no application to Baker's claims for injunctive relief against Brinker (or Williams) in this case
because they are state actors. *See, e.g., Harmon v. Second Jud. Cir.*, No. 2:21-CV-00026-SEP, 2022 WL
990671, at *6 (E.D. Mo. Mar. 31, 2022) (*Monell* claims under Section 1983 do not apply to states and their
instrumentalities).

*Monroe v. Baldwin*, 424 F. Supp. 3d 526, 545 (S.D. Ill. 2019), *on reconsideration in part sub nom. Monroe v. Meeks*, No. 18-CV-00156-NJR, 2020 WL 1048770 (S.D. Ill. Mar. 4, 2020) (in case alleging that withholding proper treatment for gender dysphoria has caused serious mental health issues, "there [was] no doubt that Plaintiffs face irreparable harms that cannot be compensated by monetary damages."). If the jury finds for Baker on the merits, it is equally clear that as a matter of law the balance of hardships would justify an equitable remedy and the public interest would not be disserved by a permanent injunction.

## CONCLUSION

In light of all the facts and arguments presented, and construing all reasonable inferences in favor of Baker, Defendants have failed to meet their burden and are not entitled to summary judgment on liability with respect to Baker's Eighth Amendment claims, nor are they entitled to summary judgment on their defenses of qualified immunity or failure to exhaust administrative remedies. There are disputed issues of material fact for the jury to determine with respect to these claims and defenses. The Court must deny Defendants' motions

Respectfully submitted,

*/s/ David Kaplan*
David S. Kaplan
William R. Adams
Caroline C. Phelps
KAPLAN JOHNSON ABATE & BIRD LLP
710 West Main Street, Fourth Floor
Louisville, Kentucky 40202
(502) 416-1631
dkaplan@kaplanjohnsonlaw.com
cphelps@kaplanjohnsonlaw.com
radams@kaplanjohnsonlaw.com
***Counsel for Plaintiff,***
***Anthony (Ashley) Baker***

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 12, 2022, the foregoing was filed through the Court's

CM/ECF system which caused a copy to be served on the following:

Richard D. Lilly
Dept. of Corrections
Office of Legal Services
P.O. Box 2400
Frankfort, KY 40602
richard.lilly@ky.gov
*Counsel for Defendants Young and Williams*


Charles M. Rutledge
Diane Laughlin
Catherine M. Young
Blackburn Domene & Burchett PLLC
614 W. Main St., Ste. 3000
Louisville, KY 40202
crutledge@bdblawky.com
dlaughlin@bdblawky.com
cyoung@bdblawky.com
*Counsel for Defendants Brinker and Jordan*


*/s/ Caroline Phelps*
*Counsel for Plaintiff*
*Anthony (Ashley) Baker*